**SIGNED THIS: August 22, 2007**

_____
**MARY P. GORMAN
UNITED STATES BANKRUPTCY JUDGE**
_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| In Re ) | |
| ) | In Bankruptcy |
| JOSEF KUCERA and ) | |
| IVA KUCERA, ) | Case No. 04-75268 |
| ) | |
| Debtors. ) | |
| _____ ) | |
| ) | |
| HICKORY POINT BANK & TRUST, ) | |
|   FSB, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
|     v. ) | Adversary No. 05-7017 |
| ) | |
| JOSEF KUCERA, ) | |
| ) | |
| Defendant. ) | |

# **O P I N I O N**

The issue before the Court is whether a debt is nondischargeable under 11 U.S.C. §523(a)(2)(A) because the Debtor

-1-

deposited a counterfeit check into his checking account with the Plaintiff, Hickory Point Bank and Trust, FSB, and later defaulted on the promissory note he had given the Plaintiff to cover the overdraft.  Because no evidence was presented that the Debtor knew that the check was counterfeit or intended to defraud the Plaintiff, the debt will be discharged.

The Debtor, Josef Kucera, was born in Czechoslovakia and moved to Canada in 1980 at the age of 22.  He spent the next seven years working as an oil field technician in Canada.  He entered Walla Walla College in Washington state in 1987 and graduated with an engineering degree in 1990.  He worked in the paper industry until May, 2003, when he was hired as a reliability engineer at Archer Daniels Midland ("ADM") in Decatur, Illinois.  In June, 2003, the Debtor opened a checking account with the Plaintiff, Hickory Point Bank & Trust, FSB.  ADM owns Hickory Point Bank.

On October 8, 2003, the Debtor received an "EMAIL LOTTO WINNING NOTIFICATION" on his office computer.  The email informed him that he was a third category winner of the European Email Lotto International Lottery.  Although he had never purchased a ticket for such a lottery, he was told that his share of the jackpot was $150,000.  His lucky numbers were selected through a "computer ballot system" drawn from company and industrial email addresses from all over the world.  The email informed him that the "lottery was promoted and sponsored by the President of the World Largest

software, Bill Gates to increase the awareness of microsoft software packages" [*sic*]. Of course, the email was a scam, but the Debtor fell for it.

The Debtor spent the next year trying to secure his prize. Through emails and telephone conversations, the Debtor came into contact with a number of people who purported to be able to help him obtain his winnings.  His contacts included the following people:  Katherine Hansen, Vice-President of European Email Lotto International Holland; Richardson Brooks, the Foreign Operations Manager of Honward Trust Security Services, who acted as his agent; Alexander Smith, Head of Accounts at Midland Continental Bank; Vincent Trad of the International Remittance Department at Central Trust Investment; Nick Van Hans, Chief Financial Officer at Capital Trust Investment; Woopeng Draissler, Head of Legal Department at the European Central Bank; Lanf Williams, a barrister who acted as the Debtor's attorney; Murphy Brown, a financier; and Patrick Parker, Mr. Brown's manager.  The Debtor suspected at various times that some of these characters were not playing straight with him. However, he never doubted that there was an account with his name on it in Europe that contained his winnings from the International Lotto.

In May of 2004, the Debtor was informed that, because several winners had not claimed their prizes, the pot was being redistributed among the claimants.  This meant that his share of

the Lotto prize rose from $150,000 to $465,000.  This also meant higher transfer charges and higher taxes.

Over the course of about a year, the Debtor wired over $167,000 to various individuals to pay for the fees and taxes required to claim his prize.  He had to pay transfer charges, marginal difference charges, a winning insurance premium and a fund insurance premium, an account activation fee with Midland Continental Bank, and online fee charges.  He had to purchase various certificates such as a Netherlands' Ministry of National Economy and Finance Certificate, a Certificate of Antiterrorism/Drug Clearance, a Fund Agreement Certificate, a European Union Foreign Asset Control Certificate, a European Central Bank Tax Clearance Certificate, a Euro Equivalent Certificate, a Company Income Tax Payment Certificate, and certain excise-related certificates to protect the European Union.  He was told that these certificates were required by the European Patriot Act, the Bank Secrecy Act, and the extraordinary Plenary on the Financing of Terrorism and Financial Action Task Force.  He also had to pay taxes to the Netherlands, the European Taxation Union, and a tax company.  His legal fees to Barrister Williams included a chambers consultation fee, a fee for registration and notarization of the power of attorney at the High Court in Der Haag, and a stamp and deed duty.

By September, 2004, the Debtor was out of money.  However, he

was told that he still owed $42,050 in income taxes on his prize money.  His lawyer, Lanf Williams, agreed to assist the Debtor in obtaining a loan from his "overseas partners in Canada."  Murphy Brown, a financier, agreed to loan the Debtor 40,000 Euros in exchange for 5% of the lotto prize and certain administrative charges.  Mr. Brown referred the Debtor to his manager, Patrick Parker, to work out the details of the loan.  The Debtor was told that he would be getting a check for $48,000 in US dollars from Canada by DHL courier service.  The Debtor was told to pay a $1,500 administrative fee to get the check and he paid that fee as soon as he received his next paycheck.

On the morning of Friday, September 17, 2004, a check in the amount of $48,100 was delivered to the Debtor's house by a DHL driver.  The Debtor's wife accepted the check.  The Debtor went home on his lunch break to get the check.  The check looked like what the Debtor was expecting - Patrick Parker's signature was on the envelope and the check came from the Toronto, Ontario area. The check was drawn on the account of Huronia Transportation, Inc. with the Bank of Montreal.

The Debtor took the check to the Plaintiff's downtown branch in order to deposit it in his account.  He asked the teller how long it would take the check to clear.  He was informed that the Plaintiff would place a seven-day hold on the check because the payor was in Canada and the check was in a large amount.

The Plaintiff checked with the Bank of Montreal and was told that a check of the amount in question drawn on the Huronia Transportation account would clear.  After receiving notification from the Federal Reserve Bank that the check had cleared, Plaintiff released its hold on the $48,100 check on September 24, 2004.  Debtor then wired $45,000 to a Belgian bank to cover a payment due to the tax company and sent another $3,679 to a European bank account on October 4, 2004, to cover "cost of transfer" charges.

In mid-October, 2004, the parties learned that the $48,100 check was counterfeit.  The check was not actually drawn by Huronia Transportation and the check was not honored by the Bank of Montreal.

After learning that the check was counterfeit and had bounced, Plaintiff required the Debtor to sign a promissory note in the amount of $48,000 to cover the overdraft on his checking account.  The note was signed on October 15, 2004, and was due on November 15, 2004.  The Debtor stated that he signed the note because the Plaintiff had frozen his checking account and he needed the account released so he could use his pay automatically deposited into the account to pay bills.  He expected to pay off the note with a $50,000 check that was supposed to be coming to him from Patrick Parker who had promised to make the prior, counterfeit check good.

The Debtor received the new check for $50,000 in the third

week of October, 2004.  Instead of depositing this check with the Plaintiff, the Debtor handed it over to the local authorities and the FBI.  The Debtor hoped that this check would be good because it was drawn on an insurance company which he thought would be a better source for investment funds, but he wanted to be cautious after his experience with the first check.  The second check also turned out to be counterfeit.

The Plaintiff requested the Debtor to sign a new promissory note secured by a mortgage.  Several meetings were scheduled by the Plaintiff, but the Debtor did not appear for these meetings.

The Debtor and his wife filed a petition pursuant to Chapter 7 of the Bankruptcy Code on December 1, 2004.  The Debtors listed as an asset of their bankruptcy estate a $100,000 "[c]laim against unknown persons for fraud.  This person or persons gave them a check with a forged drawer's signature and took other funds from them under false pretenses."  The Plaintiff was scheduled as holding an unsecured, nonpriority claim of $48,324.09 for a loan.

The Debtor continued to correspond with his "agent", Richardson Brooks, through February, 2005.  By this time, Mr. Brooks was telling him that his prize had grown to $502,000.  However, the Debtor had finally become skeptical and was requesting proof of Mr. Brooks' true identity in the form of a scanned picture identification, such as a driver's license.  The correspondence with Mr. Brooks and his cohorts ended in the middle of February,

2005.

On January 20, 2005, the Plaintiff filed an adversary complaint pursuant to 11 U.S.C. §523(a)(2)(A). The Plaintiff alleges that the Debtor made misrepresentations when he deposited the counterfeit check and when he signed the note to cover the overdraft. The Debtor responds that he did not know that the check was a forgery, and he did not intend to deceive the Plaintiff. He notes that he did not retain any of the funds; it was all sent overseas by wire transfer.

Section 523(a)(2)(A) of the Bankruptcy Code provides as follows:

> (a)  A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-
>
> * * * *
>
> (2)  for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-
>
> (A)  false pretenses, a false representation, or actual fraud(.)

11 U.S.C. §523(a)(2)(A).

Courts have historically required a creditor to establish the following elements by a preponderance of the evidence: (1) the debtor made a representation to the creditor; (2) the debtor's representation was false; (3) the debtor possessed *scienter*, i.e. an intent to deceive; (4) the creditor relied on the debtor's misrepresentation, resulting in a loss to the creditor, and (5) the

-8-

creditor's reliance was justifiable. Field v. Mans, 516 U.S. 59, 74-75, 116 S.Ct. 437, 446 (1995); In re Jairath, 259 B.R. 308, 314 (Bankr. N.D. Ill. 2001). The Seventh Circuit applies an expanded reading of "actual fraud" to include any deceit, artifice, trick, or design involving direct or active operation of the mind, used to circumvent and cheat another. McClellan v. Cantrell, 217 F.3d 890, 893 (7th Cir. 2000). In order to prove a claim based on actual fraud, the creditor must prove that: (1) a fraud occurred; (2) the debtor was guilty of intent to defraud, and (3) the fraud created the debt that is the subject of the discharge dispute. Id. *at* 894; Jairath, 259 B.R. *at* 314.

A check is not a factual assertion; a check merely directs the drawee bank to pay the face amount of the check to the bearer. Williams v. U.S., 458 U.S. 279, 284-86, 102 S.Ct. 3088 (1982); In re Scarlata, 979 F.2d 521, 525 (7th Cir. 1992). Therefore, the presentation of a bad check alone does not constitute a false representation, false pretenses, or fraud which would be nondischargeable under §523(a)(2)(A). In re Trevisan, 300 B.R. 708, 716 (Bankr. E.D. Wis. 2003). A plaintiff must prove that the debtor made an express representation that the check was good other than the issued check itself. Id. *at* 717. The Plaintiff failed to introduce any evidence which would suggest that the Debtor represented that the check was good at the time he deposited the check.

The Plaintiff's downtown branch manager testified that the Debtor told her that the check was for work he had done. The Debtor denied making this statement. Several bank witnesses testified that the Debtor failed to tell them that the check was received in connection with an international lottery. Several bank employees testified that, had they been told of the true reason Debtor had received the check, they would have recognized the scam and not cashed the check. The Debtor admits that he did not tell the Plaintiff about his lottery prize, but he was not under any obligation to do so. He did tell Plaintiff's representatives that he was wiring the funds to pay overseas taxes.

No evidence was presented that the Debtor made any affirmative representation to the Plaintiff's employees when he deposited the check that he knew the check was good or that it would clear. To the contrary, he waited until the Plaintiff had put the check through normal banking channels and Plaintiff's employees had advised him that the check was good before he even attempted to draw funds out against the deposit. This Court cannot find that the Debtor made a false or fraudulent representation about the check to the Plaintiff. Because he had no idea that the check was counterfeit, Debtor's failure to volunteer information about the transaction to the Plaintiff's employees also does not constitute fraud.

Plaintiff has also failed to prove that the Debtor had the

requisite intent to defraud the Plaintiff when he deposited the counterfeit check. "Proof of intent to deceive is measured by the debtor's subjective intention at the time the representation was made." In re Monroe, 304 B.R. 349, 356 (Bankr. N.D. Ill. 2004). Because direct proof of fraudulent intent is often unavailable, fraudulent intent may be inferred from the surrounding circumstances. In re Levitsky, 137 B.R. 288, 290 (Bankr. E.D. Wis. 1992). When a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive. In re Sheridan, 57 F.3d 627, 633 (7th Cir. 1995).

The Plaintiff admits that the check's appearance gave no indication that it was counterfeit. However, the Plaintiff suggests that the circumstances surrounding the Debtor's receipt of the check should have raised the Debtor's concerns about the genuineness or legitimacy of the check. In particular, the Plaintiff notes that the Debtor received the check in connection with an international email lottery scam and that the Debtor did not perform any services for Huronia which could have earned him a $48,100 check.

The Debtor truly, although naïvely, believed that he had won a significant amount of money in an international lottery. In order to claim his prize, he believed that he needed to pay some taxes, and his European contacts arranged for an investor to loan

-11-

him the money in exchange for a percentage of the winnings. He was told that the check would be coming from a Canadian investor and drawn on a Canadian bank. The check represented an investment by Huronia; it was never intended to be compensation for services performed by the Debtor. The check arrived by DHL courier as promised by Patrick Parker, the individual arranging the loan for the Debtor, and Mr. Parker's signature was on the envelope. The check appeared to be a legitimate check. The Debtor did not know that the check was counterfeit when he presented it to the Plaintiff. There is no evidence that he intended to deceive the Plaintiff. *See* In re McClelland, 2006 WL 2827385 (E.D. Mich.) (no intent to deceive where check appeared to be official and debtor did not know that it was counterfeit); In re Maxwell, 334 B.R. 736, 741 (Bankr. M.D. Fla. 2005) (victim of Nigerian business scam may have been gullible, näive, and careless, but he did not make false representation with intent to deceive when he deposited altered check).

Plaintiff failed to prove that, in presenting the Huronia Transportation check to Plaintiff, Debtor obtained funds by fraud or false representations and failed to prove that the Debtor had any intent to deceive the Plaintiff.

As an alternate theory, Plaintiff asserted at trial that Debtor fraudulently obtained an extension of his obligation to the Plaintiff when he signed the note memorializing the obligation on

-12-

October 15, 2004.  Plaintiff alleges that Debtor obtained a forbearance from collection by signing the note and, accordingly, the obligation set forth in the note is nondischargeable.

Fraudulently-induced forbearance may constitute an extension of credit for purposes of §523(a)(2)(A).  In re Beetler, 368 B.R. 720, 730 (Bankr. C.D. Ill. 2007).  The elements of proof necessary to establish such fraudulently-induced forbearance include "discernable harm to the creditor in the sense that it had valuable collection remedies at the time of the misrepresentation, that it did not exercise those remedies based upon the misrepresentation, and that the remedies lost value during the extension period."  Id. at 730-31; In re Wyss, 355 B.R. 130, 136 (Bankr. W.D. Wis. 2006).

The Plaintiff argues that the Debtor intended to defraud the Plaintiff when he signed the promissory note to cover the overdraft.  The Plaintiff points out that the note matured in one month and suggests that the Debtor did not have any means to pay the note.  At that time, however, the Debtor still believed that his receipt of his lottery prize was just one tax payment away.  He also knew that another $50,000 check was coming, and he thought that Mr. Parker would remedy the problem caused by the counterfeit check.

The note was requested by the Plaintiff, not the Debtor, to memorialize the obligation.  By the time the note was signed, Plaintiff was aware that Debtor was a scam victim and the

-13-

authorities had already been called to investigate.  There was no testimony that the Debtor represented that he had any legitimate source of funds to pay the debt within the 30 days.  To the contrary, Plaintiff's representatives testified that they expected the Debtor to sign another note secured by a mortgage.  That note would have been paid by monthly installments from Debtor's income.

Plaintiff's forbearance in this case was limited to allowing Debtor access to his pay deposited into his checking account.  No evidence was presented as to the amount of the funds released after the note was signed.  Plaintiff's forbearance was not based on any fraud or misrepresentation by the Debtor.  Plaintiff has failed to prove fraud or false representation in the signing of the note on October 15, 2004.

For the foregoing reasons, the judgment will be entered in favor of the Debtor on Plaintiff's Complaint to Determine Dischargeability of Debt.

Debtor has requested an award of fees in the event that this Court found in his favor on the Plaintiff's Complaint.  Debtor relies on the provisions of §523(d), which require a court to award fees to a consumer debtor if a creditor brings an action under §523(a)(2) which the court determines was not "substantially justified."  11 U.S.C. §523(d).  The provisions of §523(d) are designed to prevent frivolous actions and actions where the creditor has failed to properly investigate before filing the

adversary complaint.  1 Robert E. Ginsberg & Robert D. Martin, *Ginsberg & Martin on Bankruptcy* §11.06[C] (4th ed. 1996, Supp. 2007).

This Court has heard all of the evidence and finds that, even though the Plaintiff did not ultimately prevail, it was substantially justified in bringing the action against the Debtor. Factual issues were in dispute, and the Debtor's credibility was key to this Court's ruling.  Substantial investigation was done by the Plaintiff both before filing this case and during the discovery phase of the case.  Plaintiff did not act frivolously or without substantial justification in seeking its day in court to have the Debtor's credibility put to the test.  Debtor's request for fees pursuant to §523(d) is denied.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###